O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LINCOLN TRANSPORTATION SERVICES, INC. ) ) ) Plaintiff, ) ) v. ) ) CMA CGM (AMERICA), LLC, a Limited ) Liability Company; CMA CGM S.A., a ) foreign corporation, ) ) Defendants. ) | Case No. 15-9234 DDP-RAO  **ORDER RE: CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT**  [Dkts. 67, 70, 73] |

Presently before the court are the parties' Cross-Motions for Partial Summary Judgment (Dkts. 70, 73). Having considered the parties' submissions and heard oral argument, the court adopts the following Order.

**I.     BACKGROUND**

This case arises from a dispute over haulage, equipment detention, and storage charges between the parties. Plaintiff Lincoln Transportation Services, Inc. ("Lincoln") is a California motor carrier, involved in the transport of cargo containers. (Dkt. 84-3, at 2.)

Defendant CMA CGM, S.A. is a French-based ocean common carrier and marine equipment provider, and its domestic subsidiary and agent is Defendant CMA CGM (America), LLC (collectively, "CMA" or "Defendants"). (Michalski Decl. ¶ 3.)

### A. Drayage Services

Between February 2013 and May 2016, CMA and Lincoln had an agreement under which Lincoln provided drayage, or ground haulage, for CMA in the transport of CMA shipping containers containing customer cargo. (Villareal Decl. ¶¶ 4, 5.) Under this agreement, CMA would email Lincoln transport orders for the drayage of CMA containers. (*Id*. ¶ 5.) These transport orders served as work orders, authorizing Lincoln to pick up the CMA containers, and detailed the specifics of each haul. (*Id*. ¶ 6.) Afterwards, Lincoln created invoices and billed CMA for the completed drayage. (*Id*. ¶¶ 7, 8.) Lincoln contends that CMA owes it $601,834.98 in unpaid drayage charges, as well as $1,009,727 in storage fees. (*See* TAC.)[1]

### B. Storage Fees

Lincoln states that, around June 2014, it agreed with CMA to use its Los Angeles yards as a de facto depot for CMA. (Villareal Decl. ¶¶ 3, 4.) Under this arrangement, Lincoln claims it received loaded CMA containers in its Los Angeles yards, where those containers were stored for eventual delivery to customers, or for return to other CMA depots or ports. (*Id*. ¶¶ 6, 7.)

As part of this arrangement, Lincoln states that it orally agreed with CMA on storage charges at its Los Angeles yards, first on an ad-hoc basis, and later as a matter of policy due to congestion caused by a labor slowdown. (*Id*. ¶ 41.) Between the summer of 2014 and the summer of 2015, labor negotiations resulted in congestion at the ports. (*Id*. ¶

---

[1] Lincoln originally contended that the value of the unpaid invoices totaled $602,772.42. However, upon the discovery of a duplicate invoice in the amount of $937.44 paid by CMA, Lincoln now claims that it is owed $601,834.98 in unpaid drayage fees. (Reply at 9, Dkt. 91; Arenas Decl. ¶ 11).

17.) Lincoln claims that, starting in January 2015, it began charging CMA for stored containers as a rule and notified CMA that storage rates would apply (*Id*. ¶ 41.)

CMA allegedly agreed to make these storage payments, but neglected to revise its transport orders to reflect the storage fees. (*Id*. ¶ 42.) As a result, Lincoln issued invoices to CMA in December 2015 and January 2016, after the filing of the present action, totaling $1,009,727 in storage fees. (*Id.* ¶ 45.)

### C. Detention Fees

In order to transport cargo inland, an ocean carrier like CMA loans the use of its equipment, namely containers and chassis, so that customer cargo can be hauled inland to distribution centers. (Michalski Decl. ¶ 5.) In the shipping industry, a carrier may exact a "demurrage" fee when loaded containers are not picked up at the agreed-upon time; similarly, when empty containers and equipment are not timely returned, the carrier may charge a "detention" or "per diem" fee. (*Id*. ¶ 7.) "Free time" refers to the number of days a customer or motor carrier is allowed to keep equipment, namely the container and chassis, before detention charges begin to accrue. (Villareal Decl. ¶ 12; Michalski Decl. ¶ 11.) CMA claims that Lincoln owes it $1,219,144 in detention fees from May 2014 to July 2015 for holding its equipment past the agreed-upon time. (Countercl. ¶ 9, Dkt. 34.)

Both Lincoln and CMA are signatories to the Uniform Intermodal Interchange and Facilities Access Agreement ("UIIA"). (Michalski Decl. ¶ 9, Ex. B.) The UIIA is a national, industry-wide agreement that governs the interchange and use of ocean carrier equipment by motor carriers. (Michalski Decl. ¶¶ 6, 8, 10.) CMA publishes addenda to the UIIA that set forth the schedule of "Free Time" and "Per Diem" that CMA charges for its equipment. (*Id*. ¶ 11.) The UIIA, and the CMA Addenda to the UIIA, provide that the motor carrier shall be responsible for "per diem" charges. (*Id*., Ex. C., at 6.)

The terms "carrier haulage" and "carrier store-door delivery" refer to situations when an ocean carrier engages a trucking company to provide underlying inland carrier

services for a customer.[2] (Lumley Decl. ¶ 11.) In these circumstances, the ocean carrier contracts with the customer for the cargo containers to be transported beyond the port to an inland location. (*Id*.) Conversely, the term "merchant haulage" refers to situations where customers separately arrange for a drayage trucker to transport cargo from the port to an inland location. (*Id*. ¶ 12.)

Lincoln disputes whether the UIIA applies to its carrier haulage or store-door delivery services as a "house trucker" for CMA. (Lumley Decl. ¶¶ 13; Villareal Decl., ¶¶ 13.) Instead, it argues that the transport orders issued by CMA incorporate the terms of the corresponding bills of lading. The bills of lading reference the CMA service contracts, which are written agreements between CMA and a customer for the shipping of cargo. (Lumley Decl. ¶ 19.) Lincoln claims that that the terms of these CMA bills of lading and service contracts control, to the exclusion of the UIIA.

As relevant here, the CMA-issued transport orders state that "Services provided under this Transport Order are governed by the terms of the Ocean Carrier's Bill of Lading." (*Id*. ¶ 19.) The CMA bills of lading, in turn, specify that the customer or "Merchant shall be responsible for the full payment to the Carrier . . . of the entire Freight due pursuant to this Bill of Lading," and defines "Freight" to include "detention" fees. (*Id*. ¶ 21.) The CMA bills of lading also contain language stating that "DETENTION CONDITIONS ARE BILLED PER CMA-CGM (AMERICA)'s US TARIFF OR SERVICE CONTRACTS." (Lumley Decl., Ex. I.)

The CMA service contracts typically define "detention" as "the charge the Merchant pays for detaining Carrier's equipment outside the port, terminal or depot, beyond the free time." (Lumley Decl. ¶ 17.) Many of the service contracts clarify that "[u]nder Carrier Store Door Delivery and carrier haulage conditions . . . detention is payable to CMA CGM by the Bill of Lading Consignee/Shipper." (*Id*.)

---

[2] The court adopts the term "customer" to refer in this discussion to the merchant, shipper, or ultimate consignee of the shipped goods.

4

Hence, under the CMA service contracts, detention charges are generally assessed against the shipping customer, and not the motor carrier. No CMA service contract puts detention charges on the account of the house trucker for carrier haulage or store-door deliveries. (*Id.* ¶ 17.) When CMA retained Lincoln's services as a house trucker, Lincoln claims that CMA repeatedly assured Lincoln that it "would not be charged for detention or per diem" for its services as a house trucker. (Villareal Decl. ¶ 13.)

### D. Procedural History

On the basis of these facts, Lincoln sued CMA for declaratory and injunctive relief and approximately $1.6 million in unpaid drayage and storage charges, alleging claims for (1) Breach of Interstate Transportation Contracts; (2) Quasi-Contract; (3) Open Book Account; (4) Intentional Interference with Contractual Relations; (5) Breach of Contract – Storage; (6) Quasi-Contract – Storage; (7) Open Book Account – Storage; and (8) Declaratory Relief. (*See* Third Am. Compl. ("TAC"), Dkt. 71). CMA brought counterclaims for Breach of Contract and Account Stated, alleging approximately $1.2 million in overdue detention fees. (Dkt. 34.)[3]

CMA now moves for partial summary judgment, seeking an order that (1) Lincoln owes it detention fees and related charges; (2) that Lincoln's claims for storage fees be dismissed; and (3) that Lincoln's Fourteenth Affirmative Defense to the non-payment of detention fees, based upon Cal. Bus. & Safety Code § 22928, be dismissed. (Dkt. 70.) Lincoln also moves for partial summary judgment, seeking judgment on its breach of contract, quasi-contract, and open-book account claim with respect to drayage services. (Dkt. 73.)

## II. LEGAL STANDARD

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that

---

[3] As the court indicated in its Order Denying Defendants' Motion to Strike (Dkt. 108), the court deems that the parties have consented to renew their pending motions for partial summary judgment as they relate to the TAC.

5

there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). All reasonable inferences from the evidence must be drawn in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 242 (1986). If the moving party does not bear the burden of proof at trial, it is entitled to summary judgment if it can demonstrate that "there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 323.

Once the moving party meets its burden, the burden shifts to the nonmoving party opposing the motion, who must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. Summary judgment is warranted if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. There is no genuine issue of fact "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

It is not the court's task "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1278 (9th Cir. 1996). Counsel have an obligation to lay out their support clearly. *Carmen v. San Francisco Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001). The court "need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposition papers with adequate references so that it could conveniently be found." *Id.*

**III. DISCUSSION**

## A. Detention Fees

CMA contends that, between May 2014 and July 2015, Lincoln used thousands of CMA's containers, truck chassis, and other equipment in the transport of customer cargo. (Michalski Decl. ¶ 13, Dkt. 67.)[4] CMA claims that Lincoln's use of this equipment was subject to the terms and conditions of the UIIA, an industry-wide agreement to which CMA and Lincoln are both parties. (*Id*. ¶ 9.) As relevant here, CMA's Addenda to the UIIA provides that the "motor carrier," Lincoln, is responsible for "per diem, fines, encumbrances, condition, and the ultimate safe return of the equipment" to CMA. (*Id.* at D.) CMA therefore reasons that Lincoln is liable for detention charges arising from the untimely return of CMA equipment.

Lincoln counters that the UIIA does not apply because its terms were superseded by the individual bills of lading and service contracts between CMA and its customers.[5] The CMA transport orders, pursuant to which Lincoln provided drayage services, are governed by the CMA bills of lading, which incorporate the CMA service contracts.[6] (*Id.* ¶¶ 19, 21.) Relying upon the language of these service contracts, Lincoln argues that no detention fees apply to the performance of its duties as a house trucker for CMA.

Lincoln's first argument rests on the ocean shipping provisions of the Shipping Act, 46 U.S.C. § 40101 *et seq*. Under the Shipping Act, an ocean common-carrier like CMA may not "provide service . . . not in accordance with the rates, charges, classifications, rules, and practices contained in a tariff published or a service contract" filed with the

---

[4] Although Lincoln objects to CMA's use of the Michalski Declaration on the grounds that Michalski was not disclosed as an expert witness, the court elects to consider those portions of the declaration that do not relate to his purported expert status but his role and experience as CMA's Vice President of Inland Operations.

[5] Lincoln also argues that the CMA Service Contracts constitute exempted bilateral agreements under the UIIA. This cannot be so, as that provision expressly requires the signatures of the relevant parties in order for an agreement to supersede the UIIA, a condition not satisfied here. (Michalski Decl., Ex. A at 8.)

[6] The CMA bills of lading provide that the "Merchant shall be responsible for the full payment to the Carrier. . . of the entire Freight due pursuant to this Bill of Lading," where "Freight" is defined to include detention charges. (Lumley Decl. ¶ 21.)

Federal Maritime Commission. *Id*. § 41104(2)(A). Nor may CMA "engage in any unfair or unjustly discriminatory practice in the matter of rates or charges" or "give any undue or unreasonable preference or advantage" with respect to any port. *Id*. §§ 41104(5), 41104(9).

Lincoln argues that CMA's imposition of detention fees on it, as a house trucker, rather than on the customer, as provided in the CMA service contracts, runs afoul of the Shipping Act. The CMA service contracts place the burden on the shipping customer to pay detention fees. Typically, these service contracts state that the "Bill of Lading Shipper/Consignee" is responsible for detention fees.[7] (Lumley Decl. ¶ 17.) Therefore, Lincoln reasons that CMA's practices are "not in accordance with the rates, charges, classifications, rules, and practices contained in" its service contracts. 46 U.S.C. § 41104(2).

The court agrees with this reading. Here, the vast majority of the CMA service contracts contain a provision called Term 101. Term 101 sets forth the following practices:

- "Under **Carrier Store Door Delivery and carrier haulage conditions** (CMA CGM makes cargo delivery and collection arrangements), detention is payable to CMA CGM by the Bill of Lading Consignee/Shipper." (Lumley Decl. ¶ 17.)[8]
- "Under **Merchant haulage conditions,** *per diem* is payable to CMA CGM by the Bill of Lading Consignee/Shipper. Without waiving its rights against the Consignee/Shipper, CMA CGM will forward invoices to the trucker for direct payment to CMA CGM." (*Id*.)
- "Charges for detention and *per diem* under Carrier haulage conditions will be billed and paid directly by the Bill of Lading Consignee/Shipper." (*Id*.)

Other CMA service contracts contain similar language indicating that detention fees are to be paid by the customer, *i.e*. the "Shipper/Consignee or Merchant." (*Id*. ¶ 17.)

---

[7] Lincoln rests this conclusion upon a review of over 12,000 pages of service contracts produced by CMA. (Lumley Decl. ¶ 16.)

[8] Additionally, "Detention" is defined as "the charge the Merchant pays for detaining Carrier's equipment outside the port, terminal or depot, beyond the free time." (Lumley Decl. ¶ 17.)

8

None of the service contracts provide that detention fees are on the account of the drayage trucker for carrier haulage or carrier store-door delivery. (*Id.*)

Lincoln argues that CMA would provide an unanticipated boon to shipping customers if it elected to shift the detention fees contemplated in these CMA service contracts to motor carriers. In fact, CMA's employees admit that, under their invoicing system, they assigned detention fees to Lincoln, and not the shipping customer, as a matter of default and placed the burden on the drayage trucker to contest the charges. (*See* Jefferies Dep. 68:11-19 ("All of our detention invoices go to the truckers for carrier haulage moves.").) This practice, the court concludes, is "not in accordance with" the rates, charges, classifications, rules, and practices contained in . . . a service contract." 46 U. S. C. § 41104(2).

Instead, the court finds that the language of the CMA service contracts must control with respect to detention fees for carrier haulage and carrier store-door delivery performed by Lincoln as a house trucker for CMA. Of course, this is not to say that CMA cannot impose per diem fees on Lincoln in other circumstances, or that CMA may not elect to waive detention fees when delays are not the fault of the shipping customer. However, the court concludes that the specific language of the CMA service contracts governs liability for detention fees imposed by CMA in carrier haulage and carrier store-door delivery situations. The same principle may apply to merchant haulage performed under CMA service contracts with similar language.[9]

This reading, moreover, harmonizes the language of the UIIA with that of the CMA service contracts. The UIIA does not specifically define "detention," but refers to "per diem" charges assessed to motor carriers. (Michalski Decl., Ex. B, at 2.) The per diem is the "[c]harge to be paid when intermodal Equipment is not returned by the end of the

---

[9] In merchant haulage situations, however, it is unclear whether Lincoln may be considered a "Merchant" under certain CMA bills of lading and held liable for detention fees on this basis. (*See* Lumley Decl., Ex. H (defining "Merchant" as "Shipper, Holder, Consignee, Receiver of the Goods, any Person owning or entitled to the Possession of the Goods or of this Bill of Lading and anyone acting on behalf of such person").)

9

allowable free time to its origin or to another location, as previously agreed to." (*Id.*) The UIIA and CMA Addenda state that the motor carrier is responsible for "per diem" fees. (*Id.* at 6; Ex. C, at 3.) The CMA invoices and service contracts, however, reference "detention" fees. (Lumley Decl. ¶ 17; *Id.*, Ex. K.) Although the two terms are sometimes used interchangeably, there may be material differences in meaning between "detention" and "per diem." *See* Fed. Mar. Comm'n, *Report: Rules, Rates, and Practices Relating to Detention, Demurrage, and Free Time for Containerized Imports and Exports Moving Through Selected United States Ports* at 9 n.4, 19 (2015) (defining detention as "a charge assessed by the [carrier] to the shipper for the use of its equipment after the expiration of free time," and per diem as "the charge to the draymen for the use of the [carrier's] equipment"). Thus, the per diem fees at issue in the UIIA and detention fees detailed in the CMA contracts and invoices may arise in different circumstances.

Additionally, the CMA bills of lading appear to envision motor carriers providing in-house drayage services, like Lincoln, as "Sub-Contractors" or "Underlying Carriers," used by CMA "for any part of the transportation covered by the Bill of Lading." (Lumley Decl., Ex. H.) In this capacity, Lincoln submits that it "did not have direct contact with CMA's carrier haulage or store door customers (except for contact with those for [whom] it was nominated as a preferred trucker under [CMA] Service Contracts) or have any control over those CMA carrier haulage or store door customers in receiving or returning CMA equipment." (Opp. at 3, Dkt. 84; *see* Villareal Decl. ¶¶ 13, 15.) Yet Lincoln asserts that many of CMA's detention-fee invoices "bill Lincoln for periods in which the containers were in the custody of CMA's customer." (Villareal Decl., ¶¶ 13, 14, 47; Lumley Decl. ¶ 25.) These circumstances, too, support the court's conclusion that the more specific language of the CMA service contracts prevails over the UIIA and governs detention charges incurred by Lincoln in carrier haulage and carrier store-door delivery situations.

Furthermore, the court finds that Lincoln has raised a triable issue of fact as to whether some of the detention fees at issue were incurred during gate closures. Under

10

California law, detention or per diem fees shall not be assessed against a motor carrier when the terminal gates are closed, including as the result of labor disruptions. Cal. Bus. & Prof. Code § 22928(b)(1). Lincoln points to evidence of a labor slowdown that occurred around the dates of the detention charges. (Lumley Decl. ¶¶ 8-10.) Lincoln also submits emails from CMA in which no return terminal for CMA cargo containers is listed, arguing that this evidence indicates that the terminal gates were closed. (Villareal Decl. ¶ 39; *id.*, Ex. H.)[10] Taking the evidence in the light most favorable to Lincoln, the court concludes a reasonable jury could find that some detention fees were assessed against CMA in violation of § 22928, despite the closure of the truck gates.[11]

In its defense, CMA argues that, even if the detention fees were improperly imposed, Lincoln did not dispute the invoices in accordance with the dispute provisions of the UIIA. The UIIA provides that the motor carrier has thirty days from the date of the invoice to dispute "Per Diem" claims. (Michalski Decl., Ex. A at 10.) Similarly, the CMA Addenda to the UIIA state that the "Motor Carrier has thirty (30) days from the date of an invoice for . . . Per Diem claims to dispute the invoice to the Provider," and that "[a]ll disputes must be submitted in writing to our Dispute department. . . and accompanied by verifying back-up." (*Id.*, Ex. C at 4.)

The court earlier concluded that the terms of the UIIA do not apply to detention fees incurred under a CMA service contract for carrier haulage and carrier store-door delivery. Therefore, the court finds that the UIIA dispute procedures are not applicable

---

[10] CMA challenges this evidence on the basis that the emails does not expressly state that the terminal gates were closed. However, the weighing of this evidence is an appropriate function for the jury. Here, a reasonable trier of fact could infer that the emails are evidence of gate closures based on the use of "N/A" in place of an indicated gate of return. (Villareal Decl., Ex. H.)

[11] Aside from this issue, Lincoln also contends that certain detention invoices are subject to billing errors. (*See* Lumley Decl. ¶ 25.)

11

here, where the terms of the CMA service contracts govern, and the detention fees at issue are not necessarily the same "per diem" fees contemplated in the UIIA.[12]

Because the court has concluded that the more specific provisions of the CMA service contracts control with respect to detention fees incurred in carrier haulage and carrier store-door delivery, CMA's motion for summary judgment on the detention-related claims is denied.

**B. Tortious Interference with Third-Party Contracts**

Lincoln alleges that CMA tortiously interfered with its contractual relations with certain shipping customers. The elements of this claim are "(1) a valid contract between plaintiff and a third party, (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Pac. Gas & Electric Co. v. Bear Stearns & Co.*, 50 Cal.3d 1118, 1126 (1990).

This cause of action arises in part from allegations that CMA informed shipping customers that Lincoln was "locked out of the Ports," thereby preventing those customers from using Lincoln as their "preferred trucker." (Opp. at 5, Dkt. 84.) A "preferred trucker" arrangement arises when a cargo-owning customer "agree[s] to nominate Lincoln as its preferred trucker in its service contracts with Ocean Carriers."[13] (Villareal Decl. ¶ 29.) Lincoln asserts that these customers ceased using its services as a drayage trucker for CMA containers in the wake of the detention fee dispute. (*Id*. ¶ 30.)

---

[12] Lincoln has also asserted that the UIIA and CMA's Addenda are contracts of adhesion, and that CMA should be equitably estopped from asserting this defense, as it had never held Lincoln to the more formal dispute procedures. (Opp. at 12-14, Dkt. 84.) As CMA does not respond to this argument, the court may deem that it has conceded these issues for the purposes of summary judgment. *See Mossimo Holdings, LLC v. Haralambus*, No. CV 14-05912 DDP (JE), 2017 WL 1240739, at *7 (C.D. Cal. Apr. 4, 2017).

[13] In the only example of a "preferred trucker" clause offered by Lincoln, a CMA service contract contains an additional schedule entitled "Customer Nominated Trucker Option." (Villareal Decl., Ex. G.) This schedule states that "[f]or all Los Angeles/Long Beach door moves, [the customer] has a long standing [sic] arrangement with [Lincoln], which has offered the following pricing." (*Id*.)

Thereafter, Lincoln allegedly lost the business that it otherwise would have performed for those customers. (*Id.* ¶¶ 31, 33, 36.)

CMA moves for summary judgment on this claim, reasoning that it cannot be held for tortious inference with a service contract to which itself is a party. Yet the CMA service contracts are not the same as the oral contracts at issue here. Rather, the "preferred trucker" clauses in the CMA service contracts function as evidence of a separate oral arrangement between Lincoln and those customers who ship their cargo in CMA containers. In essence, these oral contracts are promises that the customer will "nominate Lincoln as its preferred trucker in its service contracts." (Villareal Decl. ¶ 29.) Such "preferred trucker" clauses are useful because, in carrier-haulage situations, it is generally the ocean carrier and not the shipping customer who formally engages the services of the motor carrier to dray the customer's cargo containers inland.

Under the terms of the oral agreement, a customer meets its contractual obligation to Lincoln by "nominat[ing] Lincoln as its preferred trucker in its service contracts with Ocean Carriers." (*Id.*; CMA Opp. at 17 (defining the oral agreements as those "in which the customer agreed to designate Lincoln as its preferred trucker").) Lincoln has not set forth evidence that its customers failed to nominate it as a "preferred trucker" in the CMA service contracts. The record is also devoid of evidence that customers replaced Lincoln with another preferred trucker under an amended CMA service agreement. Rather, Lincoln claims it was CMA who informed customers that "it had locked Lincoln out of the Ports and that [customers] could not use them to dray CMA CGM containers." (Schmelz Decl., Dkt. 84-1, ¶ 5.) Under these circumstances, the court concludes that Lincoln cannot show that any customers breached the "preferred trucker" oral contracts.

Nor has Lincoln submitted evidence that the oral agreements went further and amounted to a promise that CMA would always hire Lincoln as a drayage trucker for a customer's cargo. Under the CMA service contract, CMA had no mandatory duty to hire

13

Lincoln for drayage services. Rather, Lincoln simply served as a "preferred trucker" for certain customer deliveries.[14]

For the first time in its opposition brief, Lincoln asserts that CMA also interfered with a separate contract for "merchant haulage," (Opp. at 5), whereby one customer had a longstanding agreement with Lincoln to "dray its containers from the Ports of Los Angeles and Long Beach." (Schmelz Decl. ¶ 4.) After CMA informed the customer that Lincoln had been locked out of the ports, the customer declined to renew "the agreement with Lincoln for the drayage of CMA CGM containers." (*Id*. ¶ 6.) CMA counters that this arrangement with this customer was no more than a carrier-haulage situation. (Fox Decl. ¶¶ 3-5.) CMA's evidence, however, does not negate the possibility that a separate merchant-haulage agreement for CMA containers existed, and that CMA interfered with this arrangement between Lincoln and the customer. Because triable issues of fact remain concerning the nature of the alleged merchant-haulage agreement, the court denies summary judgment to CMA on Lincoln's claim for intentional interference with contractual relations.

**C. Storage Fees**

Around June 2014, Lincoln claims that it agreed to use its Los Angeles container yards as a de facto depot for CMA. (Villareal Decl. ¶¶ 3, 4.) Under this arrangement, Lincoln received CMA containers in its Los Angeles yards, where those containers were stored for eventual delivery to customers, or for transport to other CMA depots or ports. (*Id*. ¶¶ 6, 7.) Lincoln claims that it orally agreed with CMA on storage charges for CMA containers at its Los Angeles yards, first on an ad-hoc basis, and later as a matter of policy due to congestion caused by a labor slowdown. (*Id*. ¶ 41.)

---

[14] Even if the CMA service contracts did mandate that CMA hire Lincoln for customer deliveries, CMA cannot be held liable for tortuously interfering with a contract to which itself is a party. *See Applied Equipment Corp. v. Litton Saudi Arabia Ltd*., 7 Cal. 4th 503, 514 (1994) ("[T]he tort cause of action for interference with a contract does not lie against a party to the contract.").

14

Between the summer of 2014 and the summer of 2015, labor negotiations resulted in congestion at the ports. (*Id*. ¶ 17.) Due to the labor slowdown, "[c]ontainers could not be timely pulled from the Ports, truck drivers waited in long lines at the Ports, pickup time appointments at the Ports were missed, and full and empty containers stacked up in trucker yards and cargo owner facilities." (*Id*. ¶ 17.) Lincoln claims that, starting in January 2015, it began charging CMA for stored containers as a matter of policy and notified CMA that its storage rates would apply (*Id.* ¶ 41.) According to Lincoln, CMA agreed to make storage payments, but often neglected to revise its transport orders to reflect storage fees. (*Id*. ¶ 42.) As a result, Lincoln issued invoices to CMA in December 2015 and January 2016, after the filing of the present action, totaling $1,009,727 in storage fees. (*Id*. ¶ 45.)

CMA contends that no such storage arrangement existed, but does acknowledge that, from time to time, it would pay Lincoln for storage in a pre-pull situation. (Johnson Dep. 48:1-25; Jeffreys Dep. 33:23-25.) A pre-pull occurred when CMA instructed Lincoln to pull a container from the port to Lincoln's yards, and make delivery arrangements with the customer. (*Id*.) If the customer could not timely accept the container, then it would be stored in Lincoln's yard and Lincoln would request a storage fee from CMA. (*Id.*) In those limited circumstances, CMA agrees that it would revise the Transport Orders to reflect a storage fee to Lincoln.

Additionally, CMA contends that, through a series of emails exchanged by Lincoln's vice president Joey Villareal, Lincoln expressly agreed that no storage charges applied. (Villareal Dep. 63:1-25: Ex. 102, Dkt. 73-6.) Villareal contends that these emails were taken out of context, as they were drafted during settlement negotiations between the parties. (*Id*.) Moreover, Lincoln offers contrary evidence in the form of email exchanges where CMA employees appeared to acknowledge and accept storage fees. (Villareal Decl., Ex. J.) On this disputed record, the court concludes that there exist triable issues of fact as to when CMA agreed to pay storage fees to Lincoln.

On the other hand, Lincoln's Third Amended Complaint specifically claims that the breach of contract action for storage fees is based on a written contract attached to the pleadings. The TAC specifies that the parties entered into "a Container Yard-Depot Agreement (attached as Exhibit 'B')," where Lincoln provided CMA "secure storage space for CMA-CGM containers at Lincoln's storage facilities." (*See* TAC ¶ 30.) This agreement, attached by Lincoln to the TAC, expressly disclaims the existence of storage fees. (*See* TAC, Ex. B at 4 ("[N]o gate or storage fees at depot.").) Lincoln cannot raise a new breach of contract claim based on the existence of an oral contract that was not contemplated in the TAC. Therefore, the court grants summary judgment to CMA on the breach of contract claim.

Furthermore, the court finds that Lincoln's open-book account claim cannot survive. As evidence of unpaid storage fees, Lincoln proffers invoices that were sent, at the earliest, in December 2015 and January 2016. (Villareal Decl. ¶ 45.) These invoices correspond to storage fees spanning the period from December 31, 2013 to June 1, 2015. (Second Lerner Decl. ¶¶ 4-8.) The records for an open book account claim must "constitute a system of bookkeeping as distinguished from mere private memoranda" and "must have been kept in the ordinary course of business." *Miramontes v. Mills*, No. CV 11-8603 MMM (SSX), 2015 WL 7566491, at *9 (C.D. Cal. Nov. 24, 2015) (quotations omitted). Lincoln must also prove "the entries were either original entries or the first permanent entries of the transactions; that they were made at the time, or within reasonable proximity to the time, of the respective transactions." *Id*. Here, because the invoices correspond to events that occurred up to several years before they were issued, including after the filing of the present lawsuit on November 30, 2015, then they cannot be said to have been made "in the ordinary course of business" or "within reasonable proximity to the time[] of the respective transactions." *Id*.

However, the court finds that triable issues of fact remain as to Lincoln's *quantum meruit* claim, including whether CMA, expressly or implicitly, requested storage services for which Lincoln is owed reasonable compensation. To recover under a *quantum meruit*

16

theory, "a plaintiff must establish both that he or she was acting pursuant to either an express or implied request for services from the defendant and that the services rendered were intended to and did benefit the defendant." *Ochs v. PacifiCare of California*, 115 Cal. App. 4th 782, 794 (Ct. App. 2004). Therefore, the court grants CMA summary judgment as to Lincoln's storage-related breach of contract and open-book account claims, but denies summary judgment as to the *quantum meruit* claim on storage fees.

**D. Drayage Fees**

Between February 2013 and May 2016, Lincoln and CMA had an agreement under which Lincoln provided drayage services for CMA in the transport of CMA containers and cargo. (Villareal Decl. ¶¶ 4, 5.) Under this agreement, CMA would send Lincoln transport orders for the drayage of shipping containers. (*Id*. ¶ 5.) These transport orders served as work orders from CMA to Lincoln, authorizing Lincoln to pick up the containers and detailing the specifics of the haul. (*Id*. ¶ 6.)

After each drayage was completed, Lincoln entered the amount of money it was owed by CMA into its accounting system. (*Id*. ¶ 7, 8.) Lincoln then created invoices for CMA and billed CMA for the completed drayage. (*Id.*) Between February 2013 and May 2016, Lincoln sent CMA 1,338 invoices. (Villareal Decl. ¶¶ 7, 8.) Although CMA made a partial payment toward 44 of the invoices, Lincoln contends that CMA still owes it $601,834.98 in unpaid drayage charges. (*Id*.) Lincoln now moves for partial summary judgment on its causes of action related to these unpaid drayage fees. (*See* TAC ¶¶ 8-19.)

In its defense, CMA contends that it is entitled to an off-set of $1,219,144 for detention fees that Lincoln failed to pay. CMA also claims that Lincoln's accounting is defective and that the unpaid invoices total $516,353.45 when various billing discrepancies are accounted for, a discrepancy of $85,481.53. In support of its claims, CMA relies upon the declaration of Gladys Cruz, the manager of Accounts Payable at CMA CGM (America), LLC. (Cruz Decl. ¶ 1.) Attached to Cruz's declaration is a "spreadsheet listing all invoices by number, amount, and date for invoices that CMA

17

CGM agreed to pay Lincoln for drayage services pursuant to a Transport Order issued by CMA CGM and which have not, to date, been paid." (*Id*. ¶ 11.)

Lincoln disputes the existence of the billing discrepancies identified by Cruz, and further alleges that Cruz's declaration and spreadsheet should be excluded under Federal Rule of Civil Procedure 37(c)(1) because CMA has not adequately fulfilled its disclosure duties in the course of discovery. Under Federal Rule of Civil Procedure 26(a)(1), parties are required to make initial disclosures of discoverable information. Federal Rule of Civil Procedure 26(e)(1)(A) further requires that parties supplement or amend their disclosures or discovery responses if they are "incomplete or incorrect" in a material way.

CMA did not identify Cruz as a person likely to have discoverable information in its initial disclosures. (Arenas Decl., Ex. A at 2, Dkt. 91.) Moreover, CMA did not identify or produce the spreadsheet attached to Cruz's declaration in response to any discovery requests, including Lincoln's Requests for Admission and Interrogatories, or in its disclosures. (*See* Arenas Decl. ¶ 3, Dkt. 91; Arenas Decl., Exs. A, B, Dkt. 70-6.) Because CMA's non-disclosure was not "substantially justified" or "harmless," the court finds grounds under Rule 37(a) to bar CMA from "us[ing] that information or witness to supply evidence on a motion, at a hearing, or at a trial." Fed. R. Civ. P. 37(c)(1). The court thus agrees with Lincoln that it will only reserve for trial "those specific invoices that CMA can now identify and support through documentation, as a basis to dispute the remaining [unpaid drayage invoices]." (Reply at 5.) That is, the court will not permit CMA to rely upon documents that CMA should have, but did not, provide to Lincoln in discovery, including the spreadsheet attached to Cruz's declaration. Nor will the court permit CMA to use Cruz's testimony at trial.

Still, drawing upon existing invoices produced by Lincoln in discovery, CMA casts doubt upon whether a small number of the unpaid drayage fees claimed by Lincoln were properly invoiced.[15] For example, two sets of invoices share the same transport

---

[15] At most, this discrepancy would place about $3,417.75 of the $601,834.98 in dispute.

order reference number. (*Compare* Cruz Decl., Ex. C (Invoice Numbers 814465, 814466, 814467) *with id.*, Ex. D (Invoice Numbers 814464, 817230).) Some of the invoices with this transport order reference number, (*id.*, Ex. D), are for the drayage of containers that do not correspond to the specific shipping containers listed in the original transport order, (*id.*, Ex. A). For this reason, CMA contends that Lincoln over-billed for the drayage of containers not listed on the original transport order. Lincoln explains that this issue arises from the fact that CMA once used the same reference numbers for different transport orders, but that CMA resolved this issue after 2013 when it "issued only a single Transport Order for a given booking number." (Villareal Decl. ¶ 10, Dkt. 91-1.)

CMA has not identified, with reference to specific documents in the record, any other triable issues of fact regarding the drayage invoices.[16] Nonetheless, because the precise amount of detention fees owed to CMA, if any, is unclear, *see, e.g., infra* note 9, the court cannot presently determine the amount of an offset to which CMA might be entitled. Therefore, the court concludes that factual disputes concerning the amount of unpaid drayage charges as well as potential detention-fee offsets preclude summary judgment on Lincoln's breach of contract claim.

**IV. CONCLUSION**

For the reasons stated above, Defendant CMA's Motion for Partial Summary Judgment is DENIED in part and GRANTED in part. Plaintiff Lincoln's Motion for

//
//
//
//
//

---

[16] CMA contends that Lincoln also double-billed for drayage of the same containers by issuing additional invoices corresponding to the same Transport Orders. (Cruz Decl. ¶¶ 7, 8.) Yet an examination of Lincoln's own statement of accounting reveals that it did not double-bill for the specific containers identified by CMA as double-invoiced. (*See* Villareal Decl., Ex. B, Dkt. 70-5; Villareal Decl. ¶¶ 12, 13, Dkt. 91-1.)

Partial Summary Judgment is DENIED.

**IT IS SO ORDERED.**

Dated: January 18, 2018

_____
DEAN D. PREGERSON
UNITED STATES DISTRICT JUDGE